

**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: January 14, 2026.**

_____
**CRAIG A. GARGOTTA
CHIEF UNITED STATES BANKRUPTCY JUDGE**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 24-30081-CGB |
| | § | |
| MARIUS RUJA, | § | CHAPTER 13 |
| | § | |
| Debtor. | § | |

| | | |
|---|---|---|
| RABIN NOURANIFAR, | § | |
| | § | |
| Plaintiff, | § | |
| | § | ADV. NO. 24-03006-CGB |
| v. | § | |
| | § | |
| MARIUS RUJA, | § | |
| Defendant. | § | |

### MEMORANDUM OPINION AND ORDER
### ON PLAINTIFF'S FIRST AMENDED COMPLAINT FOR DAMAGES, AND FOR
### EXCEPTION TO DISCHARGE PURSUANT TO 11 U.S.C. § 523(a)(2)(A) AND (a)(6)

This Memorandum Opinion resolves the above-styled adversary proceeding filed by Plaintiff objecting to the dischargeability of his claims against Debtor-Defendant pursuant to 11 U.S.C. §§ 523(a)(2) and (a)(6).

Plaintiff Rabin Nouranifar seeks money damages for fraud and requests that such damages be deemed nondischargeable under 11 U.S.C. §§ 523(a)(2)(A) and (a)(6).[1] This Court conducted a two-day trial on August 12 and 13, 2025. The Court then heard closing arguments on September 30, 2025, before taking the matter under advisement. Thereafter, the Court reviewed the entire record before it, including all admitted exhibits. The Court also considered the testimony and credibility of all witnesses. Additionally, the Court considered all evidentiary objections raised and sustained in making its findings of fact. For the reasons stated herein, the Court finds that Defendant is not liable for a debt owed to Plaintiff, and therefore, Plaintiff's nondischargeability claims under 11 U.S.C. §§ 523(a)(2) and (a)(6) are moot.

## JURISDICTION

As an initial matter, the parties have stipulated to, and the Court finds, it has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157 and 1334 (ECF No. 19);[2] *see also **Wellness Int'l Network, Ltd. v. Sharif (In re Sharif)***, 575 U.S. 665, 684 (2015) (finding bankruptcy courts have constitutional authority to enter a final order when the parties consent). This matter is a core proceeding as defined under 28 U.S.C. § 157(b)(2)(I). The Court finds that venue is proper under 28 U.S.C. § 1409(a). This matter is referred to the Court pursuant to the District Court's Standing Order of Reference. Both parties have consented to the entry of a final order or judgment by this Court (ECF Nos. 15, 16). The Court makes its findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

## BACKGROUND

Rabin Nouranifar ("Plaintiff") objects to the dischargeability of his claims against Marius Ruja ("Defendant") pursuant to 11 U.S.C. §§ 523(a)(2) and (a)(6) and asks that this Court award

---

[1] Unless otherwise noted, all references are to Title 11, U.S.C. *et seq.*
[2] "ECF" denotes electronic filing docket number in Adversary No. 23-05034 unless otherwise indicated.

damages to Plaintiff in addition to finding his debt nondischargeable. Although this is an action regarding the dischargeability of debt, Plaintiff has pleaded independent state causes of action that include conspiracy, aiding and abetting, conversion, negligent misrepresentation, statutory fraud in connection with a real estate action, punitive damages, and attorney's fees. Defendant has filed an objection to Plaintiff's proof of claim, which will be adjudicated in connection with this dischargeability adversary proceeding.

This case involves a real estate deal gone bad. Nonparty Dr. Robert Nichols engaged both Plaintiff and Defendant to participate in a hospital project in Santa Teresa, New Mexico. Anthony Spencer was the project manager for the proposed project. Plaintiff contributed funds to the proposed project, and Defendant contributed nothing. Spencer is alleged to have stolen Plaintiff's investment, and, as such, the project failed. Plaintiff alleges that Defendant introduced Plaintiff to Spencer, who had a criminal background that Defendant should have disclosed to Plaintiff. Plaintiff also alleges that Defendant misled Plaintiff by not contributing money, but property to the project that was inadequate for the project to succeed. Plaintiff and Defendant testified, and excerpts from Dr. Nichols' deposition were introduced into evidence. Spencer was unavailable to testify.

## THE PARTIES' CONTENTIONS

Plaintiff contends that Defendant introduced Plaintiff to Anthony Spencer and Dr. Robert Nichols to discuss potential investments for a hospital project in Santa Teresa, New Mexico. Spencer was introduced as the project manager. Plaintiff asserts that Defendant vouched for Spencer to Plaintiff; that Defendant would partner with Plaintiff in the project; and that Defendant would invest his own money into the project. Plaintiff argues that Defendant represented that he had done a background check on Spencer and that Spencer had no criminal history. Plaintiff also

says that Defendant told Plaintiff that the two of them would be 50/50 partners on the project, with each having a financial stake in the project. Plaintiff alleges that, based on Defendant's misrepresentations and failure to properly vet Spencer, Plaintiff lost his entire investment.

Defendant contends that he was introduced to both Dr. Nichols and Plaintiff at a meeting in Dr. Nichols' office. Defendant states that he did not go to Dr. Nichols' office with the intention to form a partnership with Plaintiff, but rather to investigate if there was an investment opportunity in New Mexico. Defendant recognized a potential business opportunity to establish a relationship with medical doctors in Santa Teresa, as the local community was underserved by both chiropractors and physicians who could make referrals to one another.

Defendant asserts that the meeting in Nichols' office was exploratory in nature and that it was after the initial meeting with Nichols that Plaintiff and Defendant discussed securing contracts for pods for medical providers. Defendant and Plaintiff would contribute money to individual projects for the construction of pods generally described as the "hospital or Santa Teresa project." Plaintiff would identify medical providers seeking to invest in and develop their practices in Santa Teresa, and Defendant would assist in the development and management of such projects. Defendant argues that the primary purpose in doing business with Plaintiff was to help Plaintiff develop a market for his services in New Mexico. Further, there was never an intention to enter into any partnership.

**FINDINGS OF FACT**

**I.   Stipulated Facts**

On August 6, 2025, the Parties submitted a Joint Pretrial Order with their statement of stipulated facts, which the Court now adopts (ECF No. 19).

## II.    Findings of Fact (Summary of the Oral and Written Testimony) and Credibility Determinations

**Dr. Robert Nichols**

The Court agreed to consider excerpts from a prior deposition of Dr. Robert Nichols as his trial testimony.[3] The Court will limit its credibility determination regarding Nichols' testimony that he appeared in his deposition to be forthright, but not completely knowledgeable about what happened to Plaintiff's investment or what Defendant's personal/business relationship was with Anthony Spencer.

Nichols testified that all the money that Plaintiff provided for the project was "used for a legitimate purpose to move the Santa Teresa project forward."[4] Nichols explained that he agreed that Spencer would secure financing and serve as the developer to build the hospital in Santa Teresa.[5] Spencer told Nichols that he would raise all the money for the project.[6] Further, Nichols acknowledged that he trusted Spencer and conducted no background check on him.[7] Nichols stated that he was unsure how the funds for the Santa Teresa project were being spent and that he believed Spencer made false representations regarding the availability of letters of credit ("LOI") to fund the project.[8] Nichols explained that as the project continued to be delayed, he became concerned about Spencer.[9] After conducting a Google search on Spencer, Nichols discussed his concerns with a bounty hunter. Nichols learned that Spencer had been prosecuted in California and

---

[3] Dr. Nichols provided a videotaped deposition on February 9, 2023, in connection with a lawsuit that was pending in the El Paso County Court of Texas, *Nouranifar v. Ruja*, Cause No. 2018-DCV-1542. Plaintiff filed his deposition excerpts at ECF No. 31 and Defendant filed his amended deposition excerpts at ECF No. 40.
[4] Nichols Dep. 29:9–18.
[5] *Id.* at 24:8–17.
[6] *Id.* at 18–20.
[7] *Id.* at 31:18–24.
[8] *Id.* at 31:10–33:5.
[9] *Id.* at 33:9–16.

incarcerated for 15 years.[10] Based on news articles referencing Spencer, it appeared that Spencer had been involved in questionable real estate transactions.[11]

Nichols explained that he wanted Defendant to provide him with Plaintiff's email address so that Nichols could advise Plaintiff that he had concerns about Spencer's integrity and management of the Santa Teresa project.[12] Specifically, Nichols sought to warn Plaintiff of his concerns that Spencer was dishonest and untrustworthy.[13] Further, Nichols believed that Defendant was the best source to obtain Plaintiff's email address because Nichols believed that Defendant and Plaintiff were friends.[14]

Nichols testified that Defendant provided him with two emails and that, when he used the email address PTPro915@Gmail.com, he received a response that he believed was from Defendant.[15] Further, Nichols stated that Defendant gave him what he represented to be Plaintiff's email address: RabinRadiology10@Gmail.com.[16] Nichols explained that he used the Rabin email address and believed Plaintiff was responding to his emails.[17] Notably, the email response purporting to be from Plaintiff states that Plaintiff made another investment and is unable to provide an LOI or make any further investment in the Santa Teresa project.[18] Nichols also stated that, to the best of his recollection, Defendant did not dispute Plaintiff's statements in the email that Plaintiff was pulling out from investing in the Santa Teresa project.[19]

---

[10] *Id.* at 35:7–25.
[11] *Id.* at 35:18–36:5.
[12] *Id.* at 34:1–35:25.
[13] *Id.*
[14] *Id.* at 35:12–14.
[15] *Id.* at 37:1–21.
[16] *Id.* at 38:7–25.
[17] *Id.* at 40:21–25.
[18] *Id.*
[19] *Id.* at 42:6–15. As noted in the Court's rendition of Defendant's testimony, the record is unclear and confusing as to what Defendant allegedly did in providing Nichols with Plaintiff's email address.

Nichols stated that he first contacted Spencer's parole officer and then the FBI to express his concerns about Spencer and Spencer's involvement in the Santa Teresa project.[20] The FBI was unable to provide any information about any potential criminal conduct by Spencer.[21] Nichols further stated that after visiting with law enforcement individuals, he then met with Defendant to determine what Defendant knew about Spencer's activities regarding the Santa Teresa project. Nichols described Defendant's reaction to his concerns about Spencer as disinterested and that he was ready to move on from any dealings with Spencer.[22] None of the excerpts provided to the Court detail what happened after Nichols learned about Spencer's criminal background, other than that the project was not completed, and Spencer absconded with Plaintiff's money.

**Plaintiff Dr. Rabin Nouranifar**

Plaintiff testified that he was chief of radiology for his practice in El Paso, Texas. The Court found the Plaintiff's testimony credible and probative of the issues in this adversary proceeding. Plaintiff stated that he would refer his patients to Defendant, who is a chiropractor. The parties discussed establishing offices in Santa Teresa, New Mexico, where Defendant could establish a physical therapy practice. Plaintiff testified that Defendant met with Dr. Nichols in his office to discuss business opportunities in New Mexico because both parties believed that the Santa Teresa community was underserved with radiology, physical therapy, and chiropractic services. Plaintiff stated that Defendant introduced him to Spencer and that Defendant assured Plaintiff that Spencer was "clean." Plaintiff explained that, in connection with the development of a hospital project in Santa Teresa, he was interested in purchasing pods adjacent to the hospital

---

[20] *Id.* at 45:1–11.
[21] *Id.* at 46:1–9.
[22] *Id.* at 50:5–24.

project for outpatient care.[23] Plaintiff stated that he and Defendant were to put their investments in a bank account managed by Spencer for the development of a medical hospital campus.[24] Defendant memorialized this understanding by forwarding an email from Spencer indicating that Plaintiff and Defendant would each make an initial deposit of $145,145.40.[25]

Plaintiff stated that he had multiple conversations with Defendant regarding the structure of their investments. Plaintiff stated that he first discussed on October 16, 2016, by email with Defendant about investing in some pods around the hospital project, and that he and Defendant would each invest $145,140.40 to secure property around the Santa Teresa hospital project.[26] Plaintiff describes his relationship with Defendant as "partners."[27] Plaintiff stated that he and Defendant orally agreed to become partners in any project, with each contributing 50% and sharing profits or losses at 50% each. Plaintiff emphasized that he wanted a physician partner because he was new to the El Paso area, and that he wanted a physician partner to make mutual decisions.

On November 8, 2016, Plaintiff and Defendant exchanged texts with Spencer, who asked Plaintiff to invest a total of $422,756.22 in the hospital project.[28] The check is made payable to "IDEA-Urban Studio Developers," an entity controlled by Spencer. Defendant texts Plaintiff that they are equal partners in the hospital project.[29] Defendant then instructs Plaintiff to meet him the following morning for Defendant to pick up Plaintiff's check and deliver it to Spencer.[30] Plaintiff testified that based on his prior conversations with Defendant, and what he thought was the

---

[23] *See* Pl.'s Ex. 13 (Plaintiff's email to Defendant dated November 9, 2016, identifying potential pods for doctors); Pl.'s Ex. 64 (Defendant's October 26, 2016 texts to Plaintiff regarding Defendant's efforts to locate medical providers to obtain pods around the hospital project).
[24] Pl.'s Ex. 19 (Spencer's December 4, 2016 letter to Plaintiff and Defendant explaining how the financing would work for the hospital project).
[25] Pl.'s Ex. 8.
[26] Pl.'s Ex. 58.
[27] *Id.* ("[W]e (I and my 50% partner, Dr. Ruja) have discussed exclusive contracts . . . .").
[28] Pl.'s Ex. 66, at 000012.
[29] *Id.*
[30] *Id.*

substance of the texts with Defendant regarding his check for $422,756.22, Defendant was going to tender a check to Spencer in the same amount.[31] Plaintiff testified that he relied on Defendant's representations that they were partners in the Santa Teresa project, as evidenced by Defendant's sending a prospectus to other investors.[32] Plaintiff also stated that by December 2016, he had made substantial investments with Defendant in the Santa Teresa project.[33] Further, on December 5, 2016, Plaintiff asked Defendant why he had invested more in the project than Defendant did.[34] By December 2016, Plaintiff states that Defendant had not told him that he had not made any deposits for the Santa Teresa project. Spencer continued to correspond with both Plaintiff and Defendant, assuring them that the Santa Teresa project was on track.[35]

In addition, Spencer contacted both Defendant and Plaintiff on March 17, 2017, with another investment proposal to build townhouses. Spencer suggested to Plaintiff and Defendant that the three of them form an LLC to facilitate the development of the project.[36] Plaintiff subsequently withdrew $150,000 (in two payments) from his E*Trade securities account and transferred it to IDEA-Urban Studio Developers' bank account. Plaintiff explained that he expected and understood that Spencer and Defendant made similar investments. On April 17, 2017, Spencer sent Plaintiff and Defendant a proposed joint venture agreement between the three

---

[31] Pl.'s Ex. 24. Plaintiff sent Defendant an email on December 27, 2016, with attached unexecuted term sheets proposing that Plaintiff and Defendant enter into an agreement with a third doctor, Dr. Don Burris. Plaintiff maintains that he sent the documents to Defendant under the belief that they were partners for future projects.

[32] Pl.'s Ex. 28. See also Pl.'s Ex. 100, wherein Plaintiff sought additional investment in the Santa Teresa project by sending architectural renderings to potential investors.

[33] Pl.'s Ex. 94 (copies of checks in the amount of $72,572.70 and $422,756.82 made payable to IDEA-Urban Studio Developers for the Santa Teresa project). See also Pl.'s Ex. 19, wherein Spencer explains how the Santa Teresa project will be financed with a loan from Wells Fargo.

[34] Pl.'s Ex. 70, at 000019 ("Why is it that I have paid $422,756.4 + $72,572.7 in total deposit and you have paid $350,184.95?").

[35] Pl.'s Ex. 43 (Spencer's March 30, 2027 email to Plaintiff and Defendant about the variety of health care services to be offered on the hospital campus).

[36] See Pl.'s Ex. 41 (Spencer's email to Defendant and Plaintiff detailing a newly formed LLC and naming Spencer, Plaintiff, and Defendant 33% owners in the proposed project with an initial investment of $250,000.00 payable to IDEA-Urban Studio Developers).

of them for the construction of townhouses in El Paso, Texas.[37] Schedule 1 to the proposed Joint Venture Agreement indicates that Spencer and Plaintiff would each contribute $1 million to the project and that Defendant would contribute "sweat equity."[38] Plaintiff explained that around April 2017, he became concerned about his investments with Spencer and Defendant. Further, Nichols also had concerns about Spencer's representations regarding the Santa Teresa project and asked Defendant to provide him with Plaintiff's email address so that he could consult with and warn Plaintiff about Spencer's past criminal history.[39]

Plaintiff concluded his direct examination by stating that he conducted reasonable due diligence regarding Spencer by relying on Defendant's representations that Spencer could be trusted. Further, Plaintiff explained that he would not have made investments with Spencer without Defendant's involvement. Plaintiff stated that, given his loss of money and what Plaintiff believed was Defendant's misrepresentations, he closed his practice in El Paso and moved to New York.

**Dr. Mario Ruja**

The Court recognizes that there has been a terrible financial loss to Plaintiff. The Court also received evidence that Defendant has suffered a personal loss. This litigation has resulted in his wife divorcing him, his losing custody of some of his children, and his income having significantly declined. Defendant explained that he earns a modest income—$5,000.00 per month—by operating his clinic (with one employee) and by working at other clinics. He also pays $1,800.00 per month in child support. The Court finds Defendant's testimony for the most part credible, except for Defendant's assertion that Defendant did not consider himself to be in an

---

[37] Pl.'s Ex. 50.
[38] *Id.*
[39] Pl.'s Ex. 106.

informal partnership with Plaintiff. Defendant's email and texts with Defendant demonstrate that Defendant referred to Plaintiff as a partner.

Defendant explained that he had met Spencer prior to his investments with Plaintiff. Defendant explained that he became acquainted with Spencer through his relationship with Guillermo Barajas (an architect), who is Spencer's brother-in-law and Defendant's friend. Defendant stated that he assumed that Barajas would have conducted a background check on Spencer. Defendant explained that Barajas and Spencer approached him in approximately 2015–2016 to discuss the construction of a wellness facility to help individuals become fit. Thereafter, Barajas and Spencer approached Defendant about a hospital project in Santa Teresa. Defendant admitted that he was seeking investment opportunities in the El Paso area. Defendant and Plaintiff were introduced by a friend of Defendant's to discuss the feasibility of a building project involving radiology and related medical services. Defendant and Plaintiff expressed mutual interest in exploring investment opportunities in a medical facility.

Originally, Plaintiff discussed with Defendant the possibility of Defendant being a tenant in a project he intended to develop on an unimproved lot he owned. Defendant rejected that idea but countered that maybe Plaintiff would be interested in investing in a hospital project in Santa Teresa, New Mexico. Defendant explained that the project was in its early stages of development. Thereafter, with the help of Barajas, Defendant testified that he met with Spencer, Barajas, Plaintiff, and Nichols in Dr. Nichols' office to discuss potential hospital projects. Defendant insists that at this time Plaintiff wanted exclusive business opportunities and that there was no discussion about Plaintiff and Defendant being partners.

After the initial meeting that Barajas arranged, Spencer, Defendant, and Plaintiff met at Nichols' office. Defendant stated that Spencer sent him and Plaintiff architectural drawings and

renderings of pods to be built in Santa Teresa. Defendant explained that his interest in the hospital project was to serve as an anchor tenant, but Plaintiff envisioned a much more expansive project involving medical providers. Defendant stated that, because Plaintiff could not monitor developments in Santa Teresa due to his radiology practice in El Paso, he wanted Defendant to manage the project. Further, Defendant maintained that he insisted that a partnership agreement be drafted and executed before Defendant would consider himself a partner with Plaintiff. Moreover, Defendant asserted that Plaintiff used the word "partner" to describe his business relationship with Defendant, but that Defendant cautioned Plaintiff that they were not partners without an executed partnership agreement.

Defendant testified that he had conversations with Spencer regarding Defendant's intention to contribute land to the Santa Teresa project. Defendant stated that he told Spencer that he and his wife owned approximately 21 acres of unimproved land in El Paso that Defendant believed was worth $480,000.00. Defendant also stated that he later told both Spencer and Nichols that he was contributing only land to the Santa Teresa project. Moreover, Defendant maintained that he did not need to tell Plaintiff that he was not investing money but land. Defendant stated that it was none of Plaintiff's business if he was contributing land or money.

Defendant acknowledged that he did not lose any money on the Santa Teresa project because he did not invest any money. Defendant testified that he forwarded Plaintiff a proposal regarding the Santa Teresa project, which required both he and the Plaintiff to make an initial investment of $145,145.40.[40] Defendant did not tell Plaintiff that he was not making a monetary investment in the Santa Teresa project. Additionally, Wells Fargo contacted Defendant to request financial documents evidencing his ability to secure collateral for a loan for the Santa Teresa

---

[40] Pl.'s Ex. 8; *see also* Pl.'s Ex. 64 (Defendant's October 4–26, 2016 texts to Plaintiff seeking his investment in the Santa Teresa project).

project. Spencer made representations to Wells Fargo that Spencer, Plaintiff, and Defendant were partners in the Santa Teresa project.[41] Conversely, Defendant asked Spencer to whom he needed to write the check for his initial investment in the Santa Teresa project.[42] Defendant also explained that Spencer had prepared a document detailing a lot-by-lot breakdown and the initial investment required for each lot. Defendant said that Spencer had indicated on Lot #10 that Defendant was given a credit of $122,604.00.[43] Defendant executed a deed of trust and security agreement securing his investment in the Santa Teresa project, which he and his wife owned.[44] Defendant testified that the value of the land contributed was $100,000.00, which was less than Plaintiff's contribution.

Defendant testified that at the time of Plaintiff's investment of $422,756.22, Plaintiff was the only one to make a monetary investment with Spencer.[45] Defendant did not tender a check in the same amount to Spencer. Nonetheless, Spencer prepared a document indicating that Defendant and Plaintiff had made a combined investment of $845,513.65 in the Santa Teresa project, apparently crediting Defendant's share of the investment even though the investment had not yet been made.[46] Defendant stated that he never told Plaintiff that his investment was land rather than cash. Further, Defendant admitted that he did not make the initial investment of $145,145.40 per his agreement with Spencer and Plaintiff.[47]

---

[41] Pl.'s Ex. 16 (Spencer's November 17, 2026, email to Wells Fargo representative regarding financing for the Santa Teresa project); *see also* Pl.'s Ex. 63 (Defendant's September 6–16, 2016 texts to Plaintiff using the word "partner" regarding the development of the Santa Teresa project).

[42] Pl.'s Ex. 66, at 000013 ("Tony, please advise who I write the check to.").

[43] Pl.'s Ex. 11.

[44] Pl.'s Ex. 47.

[45] Pl.'s Ex. 66, at 000013 (copy of the check that Plaintiff wrote to IDEA-Urban Studio Developers).

[46] Pl.'s Ex. 19.

[47] Pl.'s Ex. 7. See also Pl.'s Ex. 58, wherein Plaintiff thought that he and Defendant had both made the initial investment of $145,145.40 by October 16, 2016. Plaintiff indicated in his email that he and Defendant were "partners" in writing banks for financing for the Santa Teresa project.

In addition to Defendant's failure to disclose to Plaintiff his failure to contribute cash to the Santa Teresa project, Defendant and Plaintiff continued to pursue bank financing for the Santa Teresa project. During late 2016 and early 2017, Defendant received multiple requests from banks to provide financial information to process his loan application.[48] Defendant testified that by April 2017, he had misgivings about Spencer's involvement in the Santa Teresa project[49] and whether he and Plaintiff could rely on Spencer to complete the Santa Teresa project.[50]

The Court also received evidence that at approximately the same time that Defendant was collaborating with Spencer and Plaintiff about the Santa Teresa project, Spencer was also engaged with Defendant and Plaintiff about investing in a townhome development project in El Paso.[51] The townhouse project required an initial investment from Defendant.[52] Further, according to Spencer in a March 30, 2017, email to Plaintiff and Defendant, Plaintiff was to contribute $250,000 to initiate the townhouse project.[53] Spencer subsequently sent Defendant and Plaintiff a draft joint venture agreement that provided that Spencer and Plaintiff would each contribute $1,000,000.00 to the project and that Defendant would contribute "Sweat Equity" but would be listed as a 33% partner.[54]

---

[48] Pl.'s Ex. 17 (November 22, 2016 Wells Fargo email to Defendant about pre-qualifying him for a loan on the Santa Teresa Project); Pl.'s Ex. 60 (December 2, 2016 email from Wells Fargo representative to Defendant seeking financial information to complete the due diligence process to provide financing); Pl.'s Ex. 22 (December 12, 2016 Wells Fargo email to Defendant again requesting financial information to qualify him for a loan).

[49] The Court received evidence from Plaintiff suggesting that once Defendant and Dr. Nichols realized that Spencer was a con artist, that Defendant attempted to prohibit Nichols from telling Plaintiff about Spencer's bad conduct by manipulating email addresses to prevent Nichols from contacting Plaintiff by email. (Pl.'s Exs. 106, 80, 79). The import of these emails was to prevent Plaintiff from learning that Spencer had stolen his investment. The testimony on this was confusing, disjunctive, and not probative of whether the Court should find Plaintiff's debt dischargeable. As such, the Court will not consider this testimony.

[50] Pl.'s Ex. 72.

[51] Pl.'s Ex. 38 (Spencer's March 17, 2017 email to Defendant and Hank Hernandez identifying an investment opportunity for town home development).

[52] On March 22, 2017, Spencer emailed Defendant and Plaintiff to explain why an initial investment is preferable to obtaining traditional financing. Pl.'s Ex. 39.

[53] Pl.'s Ex. 43.

[54] Pl.'s Ex. 50.

By May 2017, Plaintiff believed that the Santa Teresa project had failed and requested a refund. Spencer (through IDEA-Urban Studio) issued Plaintiff a $150,000.00 check, which was returned for insufficient funds.[55] Defendant says that Plaintiff confronted him about Spencer being a convicted felon and that Plaintiff had lost all his investment. Defendant maintained that he had no reason to believe that Spencer was a criminal. Defendant testified that he had previously discussed Spencer's reputation with multiple persons and that he had examined social media to determine if he could find anything negative about Spencer. Defendant recognized that he lacked sufficient personal identifiers about Spencer to conduct a comprehensive social media search. Defendant argued that he and Plaintiff should have confronted Barajas about Spencer's theft and demanded that Barajas compensate them for their lost investments. Defendant stated that he had no knowledge of whether the Santa Teresa project was completed or whether Spencer and Nichols contributed any funds to the project.

Defendant stated that it was never his intention to defraud Plaintiff and that there was no plot or conspiracy with Spencer to steal Plaintiff's investment. Defendant also testified that he did not convert Plaintiff's investment into his own because he lacked access to it, as Spencer controlled and managed the financial aspects of the Santa Teresa project. Defendant argued that he had no partnership relationship with Plaintiff because he never agreed to be his partner, and no partnership agreement existed. Defendant admitted, however, that he has no documentation demonstrating that he contributed his land to the Santa Teresa project.

Based on the evidence adduced and the record in this proceeding, the Court can make the following findings of fact. Plaintiff lost all his investment, but there is no proof that Defendant took or received any of Plaintiff's money. The facts presented do not show that Defendant

---

[55] Pl.'s Ex. 97.

conspired with Spencer to take Plaintiff's money, nor do the facts show that Defendant conspired with Spencer to dupe Plaintiff into investing with Spencer. Further, there is no evidence that Defendant aided and abetted Spencer's misconduct or that Defendant was aware of Spencer's criminal history. The facts show that Defendant unwisely relied on Barajas to make Spencer the project manager for both the Santa Teresa and townhome projects.

The facts show that Defendant made misrepresentations to Plaintiff that Defendant would contribute money to both projects. The Court can also find that had Plaintiff known that Defendant was not contributing money to the two projects, Plaintiff would not have made his investments.

### ANALYSIS

In his First Amended Complaint, Plaintiff seeks to establish a debt owed to him by Defendant and to obtain a determination from the Court that such debt is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and (a)(6). Specifically, the Complaint brings the following causes of actions that Plaintiff alleges are nondischargeable pursuant to §§ 523(a)(2)(A) and (a)(6): (1) fraud/fraudulent inducement/fraud by non-disclosure; (2) conspiracy; (3) aiding and abetting; (4) conversion, (5) negligent misrepresentation; and (5) statutory fraud in connection with a real estate action.[56] Debtor also filed an objection to Plaintiff's proof of claim, which was consolidated with this dischargeability adversary proceeding.[57]

### I.      Objection to Plaintiff's Proof of Claim

Defendant objected to Plaintiff's proof of claim in this adversary proceeding.[58] Defendant requests disallowance of Plaintiff's proof of claim based upon his assertion that the claim is disputed, contingent, and unliquidated. The Court believes that, absent a dischargeability

---

[56] ECF No. 9.
[57] ECF No. 6.
[58] *Id.*

determination of Plaintiff's debt, Defendant wants the debt disallowed because it has not been determined to be an allowed claim.[59] There does not appear to be any basis for the objection to the proof of claim other than that the claim will be adjudicated in the adversary proceeding.[60]

"Sections 501 and 502 of the Bankruptcy Code govern the substantive basis for allowance of a claim, and Federal Rule of Bankruptcy Procedure Rule 3001 governs the procedure by which the Court determines whether a filed Proof of Claim is allowed." *Ali v. Salim A. Merch. & Electro Sales & Serv., Inc. (In re Ali)*, No. 13-50724, 2015 WL 4611343, at *30 (Bankr. W.D. Tex. July 23, 2015). Objections made in adversary proceedings are expressly permitted by Federal Rule of Bankruptcy Procedure 3007(b). Fed. R. Bankr. P. 3007(b) ("In objecting to a claim, a party in interest must not include a demand for a type of relief specified in Rule 7001 but may include the objection in an adversary proceeding.").

Plaintiff's claim is deemed allowed to the extent the claim is not objected to, and a proof of claim is prima facie evidence of the claim's validity and amount. 11 U.S.C. § 502(a); Fed. R. Bankr. P. 3001(f). Defendant bears the initial burden to present evidence to overcome the claims' validity. *In re 1701 Com., LLC*, 511 B.R. 812, 822 (N.D. Tex. Bankr. 2014). To put a claim at issue, the Defendant must identify the specific bases for its claim objection. Local R. 3007-1(b) ("All Objections to claims shall specifically set forth all bases for the objection. General denials regarding the accuracy of the claim without specific contentions regarding the disputed items may result in the Court denying the Objection.").

---

[59] The Objection to Proof of Claim is filed on November 11, 2024. (*Id.*). Plaintiff amended his complaint on April 9, 2025. (ECF No. 9). The same objection to claim is replicated and filed in Defendant's chapter 13 case. Bankruptcy No. 24-30081 (ECF No. 44). Plaintiff did file a Response to the objection to proof of claim in Defendant's chapter 13 case. (ECF No. 52).
[60] ECF No. 52, ¶ 2.

"[T]he burden of persuasion under bankruptcy claims procedure always lies with the claimant, who must comply with Bankruptcy Rule 3001 by alleging sufficient facts in the proof of claim to support the proof of claim." *In re GDC Technics, LLC*, 643 B.R. 417, 426 (Bankr. W.D. Tex. 2022). "A proof of claim constitutes prima facie evidence of the claim's validity and amount only if the claim complies with the Rules, including Rule 3001." Fed. R. Bankr. P. 3001(f). "Although there is an initial presumption of validity that attaches to all claims, claims asserted by insiders or fiduciaries demand closer scrutiny." *In re Mid-Am. Waste Sys., Inc.*, 284 B.R. 53, 69 (Bankr. D. Del. 2002)). "If the objecting party produces evidence to rebut the claim, the burden of persuasion shifts back to the claimant to establish the validity and amount of the claim by a preponderance of the evidence." *In re GDC Technics*, 643 B.R. at 426.

Here, the only basis for the claim objection is that the claim is disputed because it is being adjudicated in an adversary proceeding. If the claim is nondischargeable, it is, by implication, an allowed claim. Conversely, if Plaintiff's claim is deemed dischargeable, then the claim will be discharged and will share pro rata with other unsecured claims. As such, the Court cannot discern any basis for disallowing the claim, and the determination of Plaintiff's claim in this Adversary proceeding only relates to the dischargeability of the claim, and not if it should be disallowed. As such, Defendant's objection to Plaintiff's proof of claim is denied.

## II.      Establishment of the Underlying Debt

Before determining whether a debt is excepted from discharge under § 523(a)(2)(A), the Court must first determine whether a debt exists at all. *O'Connor v. Burg (In re Burg)*, 641 B.R. 120, 131 (Bankr. S.D. Tex. 2022); *see generally Aerotek, Inc. v. Revenue Cycle Mgmt., Inc.*, No. 09-6998, 2012 WL 860373 (Bankr. E.D. La. Mar. 13, 2012) (mooting the issue of discharge because the plaintiffs failed to establish a debt owed to them by debtor under state law). The

Bankruptcy Code defines "debt" as "liability on a claim," and "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5), (12).

The Court has determined that Plaintiff holds a claim within the meaning of the Code. The issue, then, is whether Defendant is liable for the claim under Texas law.[61] *See WMC Mortgage Corp. v. Cowin (In re Cowin)*, 492 B.R. 858, 891 (Bankr. S.D. Tex. 2013) (citing *Grogan v. Garner*, 498 U.S. 279, 283–84 (1990)) ("Although federal bankruptcy law governs dischargeability of debts, the creation and validity of a debt is determined with reference to state law."). "Plaintiff has the initial burden of establishing the underlying debt." *Ellis v. Weaver (In re Weaver)*, No. 23-3118, 2025 WL 3565099, at *6 (Bankr. S.D. Tex. Dec. 11, 2025). Defendant's sole challenge to liability is that he was not sufficiently related to Spencer (or Spencer's entity) to give rise to joint or several liability.[62] The Court therefore addresses whether Defendant is liable on the claim under Texas law before turning to the question of dischargeability.

---

[61] The parties raised the applicable choice-of-law issue at trial and indicated a willingness to provide supplemental briefing if necessary. The Court concludes, however, that the applicable law is clear. Texas law governs Plaintiff's tort claims under the "most significant relationship test" outlined in sections 6 and 148 of the Restatement (Second) of Conflict of Laws. *Osherow v. Dundon (In re Legendary Field Exhibitions)*, No. 22-05078, 2025 WL 3299149, at *90 (Bankr. W.D. Tex. Nov. 25, 2025). Here, the main issue is whether Defendant is liable for fraud, a state-law cause of action that determines the basis for the underlying debt. Section 148 states:

> When the plaintiff has suffered pecuniary harm on account of his reliance on the defendant's false representations and when the plaintiff's action in reliance took place in the state where the false representations were made and received, the local law of this state determines the rights and liabilities of the parties . . . .

Restatement (Second) of Conflict of Laws § 148(1) (A.L.I. 1971). Here, Plaintiff claims pecuniary harm on account of his reliance on Defendant's representations. Plaintiff took actions in Texas, where he met Defendant, wrote checks addressed to a Texas-based entity, and entered into an agreement to invest in real estate located in Texas. While other real property that was the subject of the agreement between Plaintiff and Defendant was located in New Mexico, Plaintiff's actions primarily took place in Texas. Additionally, Defendant's representations were made in Texas, where Plaintiff received them. Therefore, the Court applies Texas law.

[62] ECF No. 10 at 6.

### a. *Plaintiff and Defendant formed a partnership under Texas law.*

As a preliminary issue, the Court will address whether a partnership existed between Plaintiff and Defendant.[63] The existence of a partnership is pertinent to the Court's analysis of Plaintiff's claims against Defendant because Plaintiff has alleged fraud and non-disclosure of material facts. Accordingly, the resolution of whether a partnership was formed necessarily steers the Court's analysis in a different direction and informs the standards governing disclosure, reliance, and the parties' respective obligations.

Under the Texas Revised Partnership Act ("TRPA"), "an association of two or more persons to carry on a business for profit as owners creates a partnership, regardless of whether: (1) the persons intended to create a partnership; or (2) the association is called a 'partnership,' 'joint venture,' or other name." Tex. Bus. Org. Code § 152.051(b). To determine whether a partnership was formed,  courts consider five factors: (1) sharing, or the right to share, profits; (2) expression of intent to be business partners; (3) participation, or the right to participate, in control of the business; (4) agreement to share, or actual sharing of, any losses, including liability for third-party claims against the business; and (5) agreement to contribute, or actual contribution of, money or property to the business. *Id.* § 152.052(a). "TRPA does not require proof of all of the listed factors in order for a partnership to exist." ***Ingram v. Deere***, 288 S.W.3d 886, 896 (Tex. 2009). Rather, the inquiry focuses on the "totality of the circumstances" bearing on the five factors. *Id.* at 891. While sharing profits and control over the business are the most important factors, "conclusive evidence of only one factor is generally insufficient to establish the existence of a

---

[63] Plaintiff and Defendant dispute the existence of a partnership. (ECF No. 19).

partnership." *Peykoff v. Cawley*, No. 24-10186, 2025 WL 1380070, at *3 (5th Cir. May 13, 2025) (per curiam).[64]

The evidence demonstrates that Plaintiff and Defendant agreed to carry on a real estate development business for the purpose of building and developing a hospital in Santa Teresa and entering into a joint venture with Spencer to build townhomes in El Paso.[65] First, there is no dispute that Plaintiff and Defendant agreed to share profits.[66]

Second, Plaintiff and Defendant both expressed an intent to be partners. "Evidence of expressions of intent could include, for example, the parties' statements that they are partners, one party holding the other party out as a partner on the business's letterhead or name plate, or in a signed partnership agreement." *Ingram*, 288 S.W.2d at 900. On November 8, 2016, Plaintiff and Defendant exchanged a series of text messages to arrange for the delivery of Plaintiff's check to Defendant in the amount of $422,756.82.[67] Plaintiff confirmed a $20 discrepancy in the amount to be invested by each party and, jokingly, agreed to "be the majority shareholder."[68] Defendant, however, responded with "Equal partners Senior!!!"[69]

On December 27, 2016, Plaintiff emailed Defendant a term sheet prepared for Dr. Burris, whom Plaintiff and Defendant discussed retaining as a consultant for the Santa Teresa project.[70] The term sheet states that the "Rabin & Ruja Partnership would like to offer partnership to Don Burris."[71] The signature block provides a signatory line for a representative of the "Rabin & Ruja

---

[64] TRPA also lists the circumstances that, by themselves, do not create a partnership. Tex. Bus. Org. Code § 125.052(b).
[65] *See, e.g.*, Pl.'s Ex. 24 (stating "Rabin & Ruja Partnership"); Pl.'s Ex. 71 at 28 (referring to the meeting place as "the Rabin & Ruja office"); Pl.'s Ex. 100 ("Dr. M Ruja is a 50% partner.").
[66] Trial Tr. 33:19–34:12, ECF No. 42; ECF No. 19 at 5.
[67] Pl.'s Ex. 66.
[68] *Id.* at 11; *see* Trial Tr. 43:13–18, ECF No. 42 ("Looks like you're making maybe a joke. . . . It's about $20 more than [we] mentioned. We can hash it out later. Or alternatively, I will be majority shareholder. Yeah, that was it.").
[69] Pl.'s Ex. 66, at 12.
[70] Trial Tr. 48:1–15, ECF No. 42.
[71] Pl.'s Ex. 24.

Partnership."[72] *See* Tex. Bus. Org. Code § 152.302 ("[A]n act of a partner, including the execution of an instrument in the partnership name, binds the partnership if the act is apparently for carrying on in the ordinary course: (1) the partnership business; or (2) business of the kind carried on by the partnership."). Defendant, after receiving the term sheet, did not respond or object to the designation of their partnership to third parties.[73]

Additionally, during the process of obtaining financing for the Santa Teresa project, Plaintiff referred to Defendant as his "50% partner" to bank representatives.[74] While "merely referring to another person as 'partner' in a situation where the recipient of the message would not expect the declarant to make a statement of legal significance is not enough," Plaintiff intended to attribute legal significance to the term in circumstances that "indicate[d] significance to the business endeavor," to which Defendant expressed no objection. *Ingram*, 288 S.W.3d at 900 ("Referring to a friend . . . as a 'partner' in a colloquial sense is not legally sufficient evidence of expression of intent to form a business partnership . . . . [C]ourts should look to the terminology used by the putative partners, the context in which the statements were made, and the identity of the speaker and the listener.") (citation omitted). Therefore, Plaintiff has provided "content, context, and circumstances" that gave Defendant's expressions of intent legal significance as evidence of a partnership. *Id.* at 901.

Third, Defendant argued that he would primarily control and manage the clinic's business.[75] Plaintiff did not submit evidence that Plaintiff would have the equal right to make executive decisions. Fourth, Plaintiff asserts, and Defendant does not dispute, that the parties

---

[72] *Id.*
[73] Trial Tr. 48:24–49:7, ECF No. 42.
[74] Pl.'s Exs. 58, 100. Plaintiff and Defendant also privately referred to each other as "partner." Pl.'s Ex. 69, at 18; Pl.'s Ex. 65, at 10; Pl.'s Ex. 71, at 24.
[75] ECF No. 19 at 5.

agreed to share losses.[76] Last, both parties agreed to contribute money or property.[77] Defendant acknowledged at trial that he agreed to contribute to the purchase of land and development of the hospital project, as well as the townhome development.[78]

Defendant argues he did not intend to be a business partner with Plaintiff because they did not enter into a formal written agreement.[79] But a formal, written expression of intent to be partners is not required for a partnership to exist. ***Rainier Southlake DST v. Woodbury Strategic Partners Fund, LP***, No. 02-16-00263, 2017 WL 6047725, at *7 (Tex. App.—Fort Worth Dec. 7, 2017, no pet.). The parties' "speech, conduct, and writings" demonstrate an expressed intent to form a partnership. *Id.* Defendant testified that "they partnered up on a project," but would not say that they were "partners."[80] Additionally, in Defendant's Answer to Plaintiff's First Amended Complaint, Defendant objected to Plaintiff's characterization, stating that Defendant "did not represent to Plaintiff that they would be 50/50 partners."[81] In the Joint Proposed Pre-Trial Order, however, Defendant admits:

> [T]he "partnership" referenced in the complaint, which implicated Dr. Ruja, pertains exclusively to the management of the clinical laboratory, hyperbaric chamber, and dialysis services. . . . Dr. Ruja was to oversee these operations, sharing 50% profits as Dr. Ruja would bear full responsibility for managing these businesses. . . . Neither physician held ownership stakes in the hospital; their involvement was limited to securing control over specific service areas . . . . These ventures were intended to be owned solely by Dr. Rabin, with Dr. Ruja managing them on his behalf under a 50% profit-sharing arrangement.[82]

---

[76] Trial Tr. 36:7–16, ECF No. 42.
[77] Trial Tr. 152:12–16, ECF No. 43.
[78] *Id.*
[79] Trial Tr. 82–23, ECF No. 43.
[80] *Id.* at 85:12–17.
[81] ECF No. 10 at 7–8.
[82] ECF No. 19 at 5. "Judicial admission is a formal concession in the pleadings or stipulations by a party or counsel that is binding on the party making them." ***Martinez v. Bally's La., Inc.***, 244 F.3d 474, 476 (5th Cir. 2001). "While not viewed as evidence, the effect of a judicial admission is that it withdraws a fact from contention and is conclusive, unless the court allows it to be withdrawn." ***Newby v. Enron Corp. (In re Enron Corp. Sec., Derivative & ERISA Litig.)***, No. H-01-3624, 2004 WL 764663, at *6 n.4 (S.D. Tex. Mar. 31, 2004) (citation modified). Defendant has not asked the Court to withdraw any of the statements cited.

Defendant's argument is contradicted by the evidence. On December 5, 2016, Defendant forwarded a text message from Spencer to Plaintiff stating: "When it's done we will deed you your parcels and return deposits accordingly once the 100% finance is complete."[83] And on that same day, Spencer emailed Plaintiff and Defendant with a "breakdown on all of the properties being purchased by the [investors]."[84] The Court interprets the agreement between Plaintiff and Defendant as an agreement to co-own the land to be used to develop a hospital that they would jointly manage.

Defendant's attempt to distinguish between partnering up on a project and being partners "in a legal way" is unavailing.[85] One cannot meaningfully "partner" in a profit-seeking venture while disclaiming the legal consequences that flow from the relationship the statute defines. Nevertheless, the analysis turns on the totality of the circumstances, not the labels the parties use to describe their relationship. *Ingram*, 288 S.W.3d at 891.

Thus, the Court finds that the first, second, fourth, and fifth TRPA factors heavily indicate that, on "the partnership-formation continuum," a partnership between Plaintiff and Defendant existed as a matter of law. *Rainier Southlake DST*, 2017 WL 6047725, at *10; Tex. Bus. Org. Code § 152.052(a). The totality of the circumstances indicates that both Plaintiff and Defendant formed an informal partnership by agreeing to share profits equally, expressing an intent to be partners, holding themselves out as a partnership to third parties, and agreeing to contribute equally to the business.

---

[83] Pl.'s Ex. 70.
[84] Pl.'s Ex. 19.
[85] *Id.*

*b. Defendant is not liable for fraud.*

Plaintiff brings several claims for fraud against Defendant under different theories of Texas law: (1) common law fraud; (2) fraudulent inducement; (3) fraud by nondisclosure; (4) "aiding and abetting" fraud; (5) conspiracy to commit fraud; and (6) fraud in a real estate transaction under Tex. Bus. & Com. Code § 27.01.[86] The Court will address each in turn.[87]

Plaintiff first alleges that Defendant committed fraud when he told Plaintiff that he would partner with him on the hospital project, equally contribute to the financing of the project, and falsely represented a deposit of funds into the escrow account. The elements of a common-law fraud claim under Texas law are:

> (1) the defendant made a false, material representation; (2) the defendant "knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth"; (3) "the defendant intended to induce the plaintiff to act upon the representation"; and (4) the plaintiff justifiably relied on the representation, which caused the plaintiff injury.

*Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 496 (Tex. 2019) (quoting *JP Morgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653 (Tex. 2018)). The plaintiff must prove every element of fraud by a preponderance of the evidence. *Citizen Standard Life Ins. Co. v. Gilley*, 521 S.W.2d 354, 356 (Tex. App.—Dallas, no writ.). Additionally, a promise to do an act in the future is fraud "only when made with the intention, design and purpose of deceiving, and with no intentions of performing the act at the time the promise was made."

---

[86] ECF No. 9.

[87] This district categorizes fraud claims into two similar but distinct classes:

> Under Texas law, there are two types of common-law fraud: (1) simple fraud, also known as fraudulent misrepresentation, and (2) fraudulent inducement, which is when someone allegedly induces another to enter into a contract by using false representations. These are separate causes of action, but they share the same elements . . . .

*Holland v. CryptoZoo Inc.*, No. 1:23-CV-00110-ADA, 2025 WL 2493064, at *7 (W.D. Tex. Aug. 25, 2025) (quoting *Bates Energy Oil & Gas v. Complete Oilfield Servs.*, 361 F. Supp. 3d 633, 660 (W.D. Tex. 2019)). Plaintiff brought a claim for fraudulent inducement in a separate count. As such, the Court will address fraudulent inducement below.

*Clardy Mfg. Co. v. Marine Midland Bus. Loans Inc.*, 88 F.3d 347, 360 (5th Cir. 1996) (citation modified).

      1.  Defendant made a false, material representation.

Defendant's promise to contribute half of the financing was a material representation. "Material means a reasonable person would attach importance to and would be induced to act on the information in determining his choice of actions in the transaction in question." *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011). The contribution of funds to the projects was essential to the agreement between Plaintiff and Defendant, and Plaintiff testified that he would not have contemplated a project without Defendant's involvement.[88]

Additionally, the form and character of contribution to the hospital development project and the townhome projects were material facts.[89] Any reasonable person would consider the nature and character of another participant's contribution—particularly whether it consists of cash or non-liquid property—to be material to the decision to invest with that person, given the differing risk profiles associated with each form of contribution. *See Cohen v. Prudential-Bache Sec., Inc.*, 713 F. Supp. 653, 658 (S.D.N.Y. 1989) (finding "disclosures concerning riskiness, suitability and the essential nature of the investment would certainly have altered the total mix of facts available to the plaintiff, and the information misrepresented or omitted would have actual significance to the reasonable investor").

---

[88] Trial Tr. 96:24–97:2, ECF No. 42.
[89] Spencer's prior criminal history and alleged conviction of real estate mortgage fraud were also material facts. *See* discussion *infra* Section II.b.2.

It is undisputed that Plaintiff and Defendant expressly agreed to be equal contributors to the hospital project and the townhome project.[90] Defendant agrees that there was an expectation to "contribute something of value on the hospital project to match or equal Dr. Rabin's contribution."[91] Defendant argues that he did not make a false representation to Plaintiff because there was never an agreement regarding the *form* of Defendant's contribution.[92] Even accepting Defendant's contention that he never represented that he would contribute cash as true, it would not alter the fact that he agreed to contribute. Defendant did not make his promised contribution.[93] Thus, Defendant made a false, material representation.

> 2. Defendant did not knowingly or recklessly make a false positive assertion.

Plaintiff failed to prove, by a preponderance of the evidence, that Defendant made a knowing or reckless false representation. Although Defendant failed to make his portion of the contributions, his "promise of future performance constitutes an actionable misrepresentation if the promise was made with no intention of performing at the time it was made." *Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998). "[I]ntent to defraud is not usually susceptible to direct proof." *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 305 (Tex. 2006). Thus, circumstantial evidence may support reasonable inferences of intent to deceive. *Brackens v. Mayes*, No. 14-24-00424-CV, 2025 WL 2048201, at *6 (Tex. App.—Houston [14th Dist.] July 22, 2025, pet. filed). "Failure to perform, standing alone, is no evidence of the promisor's intent not to perform when the promise was made.

---

[90] Trial Tr. 152:12–16, ECF No. 43. While Defendant contests whether a partnership was formed under Texas law, Defendant concedes that the parties agreed to equally contribute to the Santa Teresa project. *See also* Pl.'s Ex. 96 (E*Trade Securities wiring instructions).

[91] *Id.*; *see also* Pl.'s Ex. 8, at 26 ("Total deposits due for both properties[:] $145,145.40"). Defendant testified that he was aware that Plaintiff personally contributed 50% of the total deposit due. Trial Tr. 109:7–15, ECF No. 42.

[92] *See* Pl.'s Ex. 115, at 5 ("Defendant did not pay money or funds to Spencer in connection with the hospital project because none of the parties involved in the project asked defendant to contribute money or funds to Spencer.").

[93] Trial Tr. 114:16–19, ECF No. 42.

However, that fact is a circumstance to be considered with other facts to establish intent." ***Spoljaric v. Percival Tours, Inc.***, 708 S.W.2d 432, 435 (Tex. 1986). In other words, Plaintiff had to present evidence that Defendant made representations with the intent to deceive and with no intention to perform as he represented.

Plaintiff alleges that Defendant made the representation that he would contribute equally to the hospital project in order to induce Plaintiff into making multiple investments in the hospital and townhome projects. "A denial that a promise was made and a failure to perform are factors showing no intent to perform when the promise was made; however, standing alone, these do not suffice." ***Coffel v. Stryker Corp.***, 284 F.3d 625, 634 (5th Cir. 2002). Here, Defendant does not deny that he represented to Plaintiff that he would perform.[94] The Court notes that when Defendant represented to Plaintiff that they were "equal partners," Defendant knew he had not yet taken steps to have his land appraised, nor had he signed any document transferring the land for the investment.[95] Defendant also never executed a real estate contract, deed, or deed of trust.[96]

The record, however, reflects that Defendant took *some steps* to effectuate the collateralization of land.[97] First, Spencer emailed a Wells Fargo representative regarding a loan to Defendant on November 17, 2016: "Dr. Ruja asked me to let him know what paperwork he needs to begin putting in order so that he has it ready for you as soon as possible."[98] The next day, the representative emailed Defendant to introduce herself and provide Defendant guidance for their first meeting.[99] On November 22, 2016, the same bank representative memorialized a telephone

---

[94] *Id.* at 132:18–22 ("Q: Okay. And to be clear, you did not make your own separate payment via check even though you told Tony, Mr. Spencer, and Dr. Rabin that you were going to give payments tomorrow morning, right? A: Yes.").
[95] *Id.* at 115–16. Defendant also acknowledges that he co-owned the land with his wife at the time, who would have to consent to the transfer.
[96] Trial Tr. 144–45, ECF No. 43.
[97] Defendant owned the land. Pl.'s Ex. 147. Defendant also credibly testified that, although he co-owned the land with his ex-wife, she was willing to approve the collateralization at the time. Trial Tr. 89:7–13, 93:13–18, ECF No. 43.
[98] Pl.'s Ex. 16.
[99] Pl.'s Ex. 59.

conversation with Defendant regarding the hospital project.[100] Other Wells Fargo representatives were included in the email that stated: "We look forward to meeting with you Monday in your offices at 10:00 am."[101]

On December 2, 2016, the bank representative emailed Defendant to request the financial information necessary to complete his financing request.[102] In that email, the representative expressed her gratitude for meeting him and hearing about "the amazing project at hand."[103] The same bank representative followed up with Defendant on December 12, 2016, to remind him to provide the required financial information to facilitate progress on his request.[104] Wells Fargo emailed Defendant again on January 27, 2017, to follow up on pending items needed for his request.[105] Finally, on January 31, 2017, Defendant received his last correspondence from Wells Fargo.[106]

Defendant neither provided the financial documents nor completed the personal financial statement. The evidence, however, demonstrates that Defendant likely intended to contribute land as collateral for a loan from Wells Fargo, specifically to contribute his half of the investment. In other words, the Court finds there was some pretense of performance by Defendant that demonstrates an intent to perform at the time he told Plaintiff he would contribute half. *Contra Coffel v. Stryker Corp.*, 284 F.3d 625, 634 (5th Cir. 2002) ("No pretense of performance by the defendant has also been held to be a factor showing lack of intent [to perform].").

Although Defendant did not explicitly state that he would make his equal contribution in the form of cash, Defendant took steps to perform his promise to contribute half of the financing

---

[100] Pl.'s Ex. 17 (requesting financial information required to complete the financing with Wells Fargo).
[101] *Id.*
[102] Pl.'s 22.
[103] *Id.*
[104] *Id.*
[105] Pl.'s Ex. 61.
[106] Pl.'s Ex. 62.

as he represented to Plaintiff. *See **Spoljaric v. Percival Tours, Inc.***, 708 S.W.2d 432, 435 (Tex. 1986) ("While a party's intent is determined at the time the party made the representation, it may be inferred from the party's subsequent acts after the representation was made."). Under Texas law, "when a duty to speak exists, silence may be misleading as to the positive misrepresentation of existing facts." **SmithKline Beecham Corp. v. Doe**, 903 S.W.2d 347, 353 (Tex. 1995) (citing **Spoljaric**, 708 S.W.2d at 435). Defendant had a duty to disclose to Plaintiff that he would be collateralizing land because they were partners and were engaged in a fiduciary relationship. **Peykoff**, 2025 WL 1380070, at *5. The Court has already found that the form and character of the contribution to the projects were material facts.[107] The Court, however, does not find that Plaintiff has established that Defendant never intended to contribute to the project.

As for the representation that Spencer was "clean," Plaintiff failed to present evidence to the Court that establishes Defendant's knowledge or reckless disregard for the truth pertaining to Spencer's background. Defendant credibly testified that he met Spencer through Defendant's professional relationship with local architect, Barajas.[108] Notwithstanding the fact that Spencer's criminal history was a material fact in Plaintiff's decision to enter into the transaction, Defendant testified that he was unaware of Spencer's criminal history up until April of 2017.[109] Defendant explained that he did not conduct a background check on Spencer when he first began working with him because he trusted Barajas, who "vetted" him out and vouched for him as family and as an "expert."[110] Plaintiff did not rebut this testimony with documentary evidence or any other circumstantial evidence that would lead the Court to conclude that Defendant fraudulently misrepresented Spencer's criminal history to Plaintiff.

---

[107] *See* discussion *supra* discussion Section.II.b.1.
[108] Trial Tr. 104:8–12, ECF No. 42.
[109] Trial Tr. 110:1–4, 113:19–23, ECF No. 43; *see* discussion *infra* Section II.b.3.
[110] Trial Tr. 105:12–17, ECF No. 42.

Because Plaintiff failed to present evidence that Defendant made representations with the intent to deceive and with no intention to perform as he represented, Plaintiff's claims for damages under common-law fraud fail.

### 3.  Defendant is not liable for fraud by nondisclosure.

Alternatively, Plaintiff argues that Defendant is liable for fraud by nondisclosure because he concealed material facts concerning Spencer's criminal history, which he had a duty to disclose. Fraud by nondisclosure is a subcategory of fraud that requires the plaintiff to prove that:

> (1) the defendant deliberately failed to disclose material facts; (2) the defendant had a duty to disclose such facts to the plaintiff; (3) the plaintiff was ignorant of the facts and did not have an equal opportunity to discover them; (4) the defendant intended the plaintiff to act or refrain from acting based on the nondisclosure; and (5) the plaintiff relied on the non-disclosure, which resulted in injury.

*Clem v. Tomlinson (Matter of Clem)*, 124 F.4th 341, 349 (5th Cir. 2024) (quoting *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 219–20 (Tex. 2019)). "When one has a duty to speak, both concealment and silence can constitute fraudulent misrepresentations; an overt act is not required." *Selenberg v. Bates (Matter of Selenberg)*, 856 F.3d 393, 399 (5th Cir. 2017) (quoting *AT&T Universal Card Servs. v. Mercer (In re Mercer)*, 246 F.3d 391, 404 (5th Cir. 2001)).

Defendant did not disclose Spencer's prior criminal history, which was a material fact. Any reasonable investor would consider the fact that the "project manager" who is responsible for his large investments into real estate projects was a convicted felon for fraud involving the type of deal with which he is engaged. *See, e.g.*, *SEC v. Prater*, 289 F. Supp. 2d 39, 52–53 (D. Conn. 2003) (finding materiality where the failure to disclose criminal history and convictions because a "reasonable investor might view [it] as important in deciding whether to trust their money" with the defendant). Plaintiff's fraud by nondisclosure claim fails, however, because the evidence does not demonstrate that Defendant had knowledge about Spencer's criminal history. The Court cannot

infer, based on any of the evidence or testimony at trial, that Defendant deliberately concealed Spencer's criminal background from Plaintiff.

Plaintiff's fraud by nondisclosure claim would nevertheless fail at the third element because Plaintiff had an equal opportunity to discover Spencer's criminal history through an internet search.[111] Plaintiff was not deprived of the ability or opportunity to conduct his own independent investigation.

Because Plaintiff has failed to prove that Defendant deliberately concealed Spencer's criminal background, and Plaintiff had an equal opportunity to discover such information, the Court need not address the remaining elements of fraud by nondisclosure.

4. Plaintiff was not fraudulently induced by Defendant to invest his money.

Plaintiff's next alternative fraud theory is fraudulent inducement. "Fraudulent inducement is a species of common-law fraud that arises only in the context of a contract." *IBM v. Lufkin Indus., LLC*, 573 S.W.3d 224, 228 (Tex. 2019) (citation modified). The elements for fraudulent inducement are:

> (1) the defendant made a material misrepresentation; (2) the defendant knew at the time that the representation was false or lacked knowledge of its truth; (3) the defendant intended that the plaintiff should rely or act on the misrepresentation; (4) the plaintiff relied on the misrepresentation; and (5) the plaintiff's reliance on the misrepresentation caused injury.

*Id.* Misrepresentation for fraudulent inducement occurs when the defendant makes a promise to perform in the future without the intent to perform. *Id.*

The Court reached a determination on Defendant's intent at the time of his representation, which Plaintiff must prove for his fraudulent inducement claim. *See Noble Cap. Fund Mgmt., LLC v. US Cap. Glob. Inv. Mgmt. LLC*, No. 1:20-CV-1247, 2023 WL 5814390, at *9 (W.D. Tex.

---

[111] *See, e.g.*, Pl.'s Exs. 72, 73 (texting internet links about Spencer's criminal history).

Sep. 7, 2023) (analyzing the defendant's intent to perform under plaintiff's fraudulent inducement claim). Thus, the Court need not determine whether the other elements of fraudulent inducement were present. Accordingly, Defendant is not liable for the underlying debt based on Plaintiff's fraudulent inducement claim.

5. Defendant did not commit statutory fraud in connection with a real estate transaction.

Plaintiff also pleads a separate cause of action for statutory fraud in a real estate transaction under Tex. Bus. & Com. Code § 27.01. Section 27.01(a) provides for what constitutes "fraud in real estate and stock transactions":

(a) Fraud in a transaction involving real estate or stock in a corporation or joint stock company consists of a
(1) false representation of a past or existing material fact, when the false representation is
(A) made to a person for the purpose of inducing that person to enter into a contract; and
(B) relied on by that person in entering into that contract; or
(2) false promise to do an act, when the false promise is
(A) material;
(B) made with the intention of not fulfilling it;
(C) made to a person for the purpose of inducing that person to enter into a contract; and
(D) relied on by that person in entering into that contract.

Tex. Bus. & Com. Code § 27.01(a). The Court construes the pleadings as asserting such a claim because it permits recovery of actual damages, attorney's fees, and exemplary damages. *Id.* § 27.01(c),(d),(e).

Fraud in a real estate transaction is a claim for statutory fraud under Texas law, which is "essentially the same as the elements of common law fraud, except as to certain aspects of the calculation of damages." ***Giarratano v. Ramirez (In re Ramirez)***, No. 24-01069, 2025 WL 2816610, at *3 (Bankr. W.D. Tex. Oct. 2, 2025) (citation modified). Although plead as a separate cause of action, Plaintiff's claim for statutory fraud in a real estate transaction is based on the same

33

allegations in his other claims for fraud. Therefore, Plaintiff's claim for statutory fraud fails, as well as Plaintiff's claim for exemplary damages under § 27.01.

> c. *Defendant is not liable for aiding and abetting or civil conspiracy.*

The Supreme Court of Texas "has not expressly decided whether Texas recognizes a cause of action for aiding and abetting." ***First United Pentecostal Church of Beaumont v. Parker***, 514 S.W.3d 214, 224 (Tex. 2017). Notably, the parties do not contest this issue of Texas law.[112] The Court, however, need not "exceed[] the bounds of its legitimacy in fashioning novel causes of action not yet recognized by the state courts." ***In re DePuy Ortho., Inc., Pinnacle Hip Implant Prod. Liability Litig.***, 888 F.3d 753, 781 (5th Cir. 2018); *see also **Primexx Energy Opportunity Fund, LP v. Primexx Energy Corp.***, 2025 Tex. Bus. 9, ¶ 196, 709 S.W.3d 619, 657 (1st Div. 2025) (dismissing the plaintiff's aiding and abetting cause of action because neither the Texas Supreme Court nor the Fifteenth Court of Appeals has recognized aiding and abetting as a separate liability apart from civil conspiracy). Thus, Plaintiff's claim against Defendant for aiding and abetting fails as a matter of law.

Civil conspiracy is a "derivative tort," meaning it depends on an underlying tort or illegal act. ***Agar Corp. v. Electro Cirs. Int'l, LLC***, 580 S.W.3d 136, 141–42 (Tex. 2019) ("[C]ivil conspiracy is a theory of vicarious liability and not an independent tort."). An action for civil conspiracy has five elements: (1) two or more persons; (2) seeking to accomplish an object or course of action; (3) meeting of the minds on the object or course of action; (4) taking one or more unlawful, overt acts in pursuance of the object or course of action; and (5) damages occur as a proximate result. ***Parker***, 514 S.W.3d at 224. Plaintiff must prove that Defendant had the "specific intent to agree to accomplish something unlawful or to accomplish something lawful by unlawful

---

[112] ECF No. 19 at 7.

means." *Id.* In other words, civil conspiracy only exists if Defendant was "aware of the intended harm or proposed wrongful conduct at the outset." *Id.*

Fraud is the unlawful purpose or means that forms the basis of Plaintiff's conspiracy and "aiding and abetting" allegations. The Court finds that the evidence does not reflect the existence of such a conspiracy. First, Plaintiff did not offer sufficient evidence of any meeting of the minds between Defendant and Spencer to commit an unlawful objective. Rather than demonstrating concerted action, Plaintiff relied on conclusory assertions first raised at the pleading stage.[113] At trial, Defendant asserted that he neither conspired nor was he aware of any fraudulent scheme devised by Spencer.[114] Accordingly, the Court finds that Plaintiff failed to offer sufficient evidence to establish Defendant's liability for the claim based on a civil conspiracy theory.

### d.  Defendant is not liable for conversion of Plaintiff's money.

Under Texas law, conversion is the "unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another, to the exclusion of or inconsistent with the owner's rights." ***Waisaith v. Lack's Stores, Inc.***, 474 S.W.2d 444, 447 (Tex. 1971). The elements of a conversion claim are: (1) the plaintiff owned, possessed, or had the right to immediate possession of property; (2) the property was personal property; (3) the defendant wrongfully exercised dominion and control over the property; (4) the plaintiff demanded return of the property and the defendant refused to return the property; and (5) the plaintiff suffered injury. ***Noll v. Noll (In re Noll)***, No. 22-05014, 2022 WL 17573643, at *7 (Bank. W.D. Tex. Dec. 9, 2022). The fourth element of conversion is unnecessary "when the possessor's acts manifest a

---

[113] ECF No. 9; *see also* Trial Tr. 18:5–9, ECF No. 42 ("[T]here's a conspiracy to commit fraud allegation in this case. That is important because a person who's in a conspiracy with another is just as responsible for the conduct as they are . . . [for] their co-conspirator.").
[114] Trial Tr. 132–33, ECF No. 43.

clear repudiation of plaintiff's rights." *Id.* (quoting *Cass v. Stephens*, 156 S.W.3d 38, 61 (Tex. App.—El Paso 2004, pet. denied).

> An action for conversion of money arises only where the money can be identified as a specific chattel, meaning it is (1) delivered for safe keeping; (2) intended to be kept segregated; (3) substantially in the form in which it is received or an intact fund; and (4) not the subject of a title claim by the keeper.

*Law.'s Title Co. v. J.G. Cooper Dev., Inc.*, 424 S.W.3d 713, 718 (Tex. App.—Dallas 2014, pet. denied) (citation modified).

While the elements for a conversion of money claim are met here, Plaintiff presented no evidence that he owned, possessed, or had the right to immediate possession of his invested money. On the contrary, the evidence shows that Plaintiff exchanged ownership of his funds for an equal share of the hospital project's profits and losses.[115] Even assuming Plaintiff had the right to immediate possession of the property, the record contains no evidence that Defendant ever wrongfully exercised dominion and control over the money.[116] Specifically, Plaintiff testified that he, under Spencer's instruction, addressed checks to an escrow account at IDEA-Urban Studio, which an associate of Spencer maintained.[117] Because Plaintiff has failed to prove that Defendant wrongfully exercised dominion and control over the money, the Court need not address the remaining elements of conversion.

> *e. Plaintiff's negligent misrepresentation claim is insufficient as a matter of law.*

Plaintiff's final argument is that Defendant negligently misrepresented Spencer's criminal past and failed to exercise reasonable care or competence in obtaining or communicating

---

[115] *See* discussion *supra* Section II.a.
[116] Defendant credibly testified that he had no control over or access to the bank accounts, had no knowledge of where the funds were deposited, and did not receive money from Spencer or Dr. Nichols. Trial Tr. 115, ECF No. 43.
[117] Trial Tr. 33:19–34:12, ECF No. 42.

information to Plaintiff regarding the projects. To prevail on a cause of action for negligent misrepresentation, a plaintiff must prove:

> (1) the representation was made by a defendant in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplied 'false information' for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffered pecuniary loss by justifiably relying on the representation.

*Crain v. City of Selma*, No. SA-16-CV-408, 2017 WL 837687, at *6 (W.D. Tex. Mar. 3, 2017) (quoting *Fed. Land Bank Ass'n v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991)).

A debt premised on this theory would be discharged by Defendant's bankruptcy. *Dare v. Jenkins*, 607 B.R. 270, 285–86 (Bankr. N.D. Tex. 2019); *Johnson v. Creason*¸ No. 22-5017, 2023 WL 6851445, at *6 (Bankr. D. Kan. Oct. 16, 2023). Thus, Plaintiff's negligent misrepresentation claim is insufficient as a matter of law.

## III. Discharged of Debt

Plaintiff has not demonstrated Defendant's liability for an underlying debt to Plaintiff.[118] Therefore, this Court need not consider whether any debt owed to Plaintiff is nondischargeable under 11 U.S.C. §§ 523(a)(2)(A) and (a)(6). Thus, Plaintiff's nondischargeability claims under §§ 523(a)(2)(A) and (a)(6) are denied as moot for lack of an underlying debt. *Husky Elecs., Inc. v. Ritz (Matter of Ritz)*, 832 F.3d 560, 562, 569 (5th Cir. 2016).

### CONCLUSION

For the reasons stated herein, Plaintiff's Complaint pursuant to 11 U.S.C. § 523 is DENIED.

---

[118] Because Plaintiff has failed to establish liability on the underlying claims, the Court denies Plaintiff's request for punitive and exemplary damages under Tex. Civ. Prac. & Rem. Code § 41.008.

Defendant is ORDERED to prepare a form of Judgment consistent with this Memorandum Opinion and submit the proposed Judgment within seven (7) days from entry of this Memorandum Opinion.

# # #